# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

--------------------------------------------------------

Basim Sabri, Marty Schulenberg, Mohamed
Cali, Jay Webb, and Zachary Metoyer,

                         Plaintiffs,

vs.

Whittier Alliance, a Minnesota not-for-profit
corporation, and City of Minneapolis,
a municipal corporation,

                         Defendants.

--------------------------------------------------------

Court File No. _____

**MEMORANDUM OF POINTS
AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION AND
TEMPORARY RESTRAINING
ORDER**

## FACTS

Defendant City of Minneapolis is a municipal corporation, organized under the laws of

the State of Minnesota.

Beginning in the late 1980s, the City developed what is called a Neighborhood

Revitalization Plan ("NRP"), now called the "Community Participation Plan" ("CPP").

Under this Plan, certain clearly municipal services such as housing assistance, public

safety, and youth development programs were to be implemented by the City through various

neighborhood organizations. These neighborhood organizations would submit plans to the City

of Minneapolis for municipal services revitalizing the City, the plans would be approved by the

Minneapolis City Council, and the neighborhood organizations would receive public funds for

administering essentially government services, within the neighborhoods.

The City established criteria for neighborhood organizations participating in the program

and receiving funds. Those criteria included, *inter alia*, the requirement of the organization:

> Provide for the participation of all segments of the neighborhood, including, but
> not limited to, homeowners, renters, property owners, business owners,

1

immigrants, non-English speakers, low-end income residents and communities of color…

Ensure that membership in the organization is open to all residents of the geographically defined neighborhood. Neighborhood organizations may not impose membership dues or require attendance at a certain number of meetings before voting rights are conferred…

Hold regular open meetings and take positive steps to encourage all interested parties to attend and participate. An organization may only hold closed meetings in case of labor management and legal disputes.

Be incorporated (or identify an appropriate fiscal agent) and have adopted by-laws. The organization must also have a grievance procedure by which its members have their concerns addressed by the organization, a conflict of interest policy and procedure, and Equal Opportunity Employment (EOE) or Affirmative Action (AA) plan and policy, and Americans with Disabilities Act (ADA) plan and policy.

Have a board of directors elected, at least in part, annually by the membership of the organization. Neighborhood residents must comprise a majority of the organizations board, an elected board must be in place for a minimum of one year prior to the beginning of the contract year to be considered eligible for funding.

Defendant Whittier Alliance has been the designated representative of the Whittier neighborhood for purposes of NRP and CPP since at least 1991. During that period, Defendant Whittier Alliance has been the exclusive neighborhood organization administering NRP or CPP funding from the Whittier neighborhood.

The Whittier neighborhood, which has been represented by Defendant Whittier Alliance, consists of 81 square blocks, bounded by Franklin Avenue on the north, Interstate 35W on the east, Lyndale Avenue South on the west, and Lake Street to the south.

Demographic data attached to the Complaint indicated that, as of the 2010 census, some 51.3% of the neighborhood was Caucasian, and the balance consisted of black or African-American, American Indian, Alaska Native, Asian or Pacific Islander, Hispanic, Latino, or other races.

Despite the fact that nearly half the population of the Whittier neighborhood consisted of people of color, including Somali, Asian, and Hispanic immigrants, Defendant Whittier Alliance's Board of Directors has remained virtually lily white.

The nearly all-white composition of the Whittier Alliance Board of Directors is no coincidence; rather, it is a result of the fact that said Board of Directors has, over the years, deliberately adopted policies designed to exclude racial and ethnic minorities and to perpetuate the incumbents in power.

Exclusionary steps have included the following:

- Adopting interpretations of the Whittier Alliance by-laws, clearly at odds with the plain language of those by-laws, for the deliberate purpose of excluding Somali-American businesses from membership in the organization and the right to vote at the organization's annual meeting.

- Deliberately failing to permit Somali businesses to register for the Whittier Alliance Business Directory, which would give them membership in the organization, and the right to vote for the Board of Directors.

- Deliberately denying to Plaintiffs, most of whom are ethnic or racial minorities, the right to run for the Board of Directors at the 2014 annual meeting, clearly for the purpose of excluding them from participation, and perpetuating the incumbent Board in power.

This latter action was appealed to Defendant City of Minneapolis through its CPP grievance procedure. The City of Minneapolis affirmed the Whittier Alliance discriminatory policies, although it declined to rule on Plaintiffs' constitutional challenge to those policies, stating it did not have jurisdiction to consider them.

The City's ruling did direct the Whittier Alliance to rewrite its by-laws to make explicit provisions for criteria to run for the Board of Directors. It in fact assigned a City CPP employee to assist Defendant Whittier Alliance in writing those criteria.

The new criteria, written with the assistance of Defendant City of Minneapolis, included the following provisions:

> Each at-large director on the Board must:…
> B.     Be able to demonstrate current and ongoing participation with the Whittier Alliance…
> F.     Not have committed an act of malice or defamation against the Whittier Alliance or any member of the Board of Directors or otherwise disrupt the aims and purposes of the Corporation.

If past precedent is to be followed,[1] the incumbent Board of Directors will decide whether or not any candidate has "committed an act of malice or defamation" against the organization or disrupted the aims or purposes of the corporation.

Plaintiffs in this case have been open in their criticism of the policies and practice of the incumbent Board, including their racially-based exclusion of Somalis as members, a racially bigoted comment made by the Executive Director to the Minneapolis Star Tribune, and the racially and politically-based exclusion of Plaintiffs from running for office. Plaintiffs have called for a special meeting to fire the Executive Director, and have sought a special meeting for removal of the entire incumbent Board of Directors.

The provisions of these by-law amendments were clearly intended to keep Plaintiffs or any other opponents of the incumbent Board from ever being able to run for the Board of Directors.

Indeed, the Metoyer Affidavit clearly indicates that Plaintiffs did not seek to run for the Board, precisely because of the discriminatory nature of these by-law amendments.

---

[1]  As noted in the Affidavit of Zachary Metoyer, the Plaintiffs were excluded from the right to run for the Board of Directors based upon a special meeting of the Board of Directors called for that purpose.

Plaintiffs now seek to restrain the scheduled March 26, 2015 election for the Board of Directors until an election can be held without these discriminatory by-law provisions being in place.

## ARGUMENT

## I.   INTRODUCTION – STANDARDS FOR ISSUANCE OF PRELIMINARY INJUNCTION.

The United States Court of Appeals for the Eighth Circuit has recently spoken extensively concerning legal standards for issuance of a preliminary injunction, where First Amendment rights are at stake and where the relief sought is an injunction against the enforcement of a law democratically enacted by a legislative body. In *Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008), the Eighth Circuit, upon a rehearing of a case[2]

In doing so, the court articulated the following standards to be employed on a federal court as requested, on First Amendment grounds, to enjoin the enforcement of a democratically enacted law:

> A court considering a motion for preliminary injunction must consider: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury in granting the injunction will inflict on the other party; (3) the probability of the movant succeeding on the merits; and (4) the public interest. [Citation omitted.] The district court weighed these considerations and concluded Phelps-Roper was not entitled to a preliminary injunction. We had weighed these same considerations and come to a contrary conclusion.

> It is well settled that a "loss of capital First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." [Citation omitted.] If Phelps-Roper can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as a result of the deprivation. [Citation omitted.] Likewise, the determination of where the public interest lies is also dependent on the

---

[2] The earlier opinion, which reversed the denial of preliminary injunction on First Amendment grounds, is *Phelps-Roper v. Nixon*, 509 F.3d 480 (8th Cir. 2008). It reaffirmed its reversal of a district court order denying a preliminary injunction in a First Amendment case.

determination of the likelihood of success on the merits of the First Amendment challenge can cause, it is always in the public interest to protect the constitutional rights. [Citations omitted.] The balance of equities, too, generally favors the constitutionally-protected freedom of expression. In a First Amendment case, therefore, the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue. [Citations omitted.]

We began at the assessment of a likelihood of a success on the merits. In *Planned Parenthood Minn. N.D. S.D. v. Rounds*, 530 F.3d 724, 732-733 (8th Cir. 2008), this Court clarified what is required to demonstrate a sufficient showing of likelihood of success on the merits. In general, "courts should still apply the familiar fair chance of prevailing test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes." [Citation omitted.] "Where a party seeks to enjoin preliminarily the implication of a duly enacted statute – as is the case here – courts must make a threshold findings that the party is <u>likely</u> (emphasis by the court) to prevail on the merits." [Citation omitted.] The court reasoned that by re-emphasizing this "more rigorous standard for determining likelihood of success on the merits in these cases, we hope to ensure that preliminary injunctions that forward the state's presumptively democratic processes are pronounced only after an appropriate differential analysis." In such cases, it is only after finding that a party is likely to prevail on the merits that a district court should weigh other *Dataphase* factors. [Citation omitted.][3]

*Id.*, at 689-690.

As a result, the Eighth Circuit has clearly determined that where a First Amendment plaintiff seeks to enjoin a democratically enacted law, it must make a showing that it is likely to prevail on the merits of the First Amendment claim. However, once such a showing is made, the plaintiff has also established the other *Dataphase* factors such as irreparable injury, but public interests, and the balance of equities. Because Plaintiffs in this case can clearly establish the likelihood of success on their First Amendment claims, this preliminary injunction should issue.

---

[3] The reference is to the district court's *en banc* decision in *Dataphase Systems, Inc. v. C. L. Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981), in which the four factors set forth, *supra*, were described with particularity.

II.     **PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR FIRST AMENDMENT CLAIM.**

A.      **DEFENDANTS' CONDUCT CONSTITUTES "STATE ACTION" WITHIN THE MEANING OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ACTION TAKEN "UNDER COLOR OF STATE LAW WITHIN THE MEANING OF 42 U.S.C. § 1983.**

The Fourteenth Amendment to the United States Constitution prohibits the State from denying to any person equal protection of the laws or life, liberty, or property without due process of law. To implement the Fourteenth Amendment, 42 U.S.C. § 1983 prohibits the deprivation of federal rights "under color of state law." The United States Supreme Court has consistently held that "state action" under the Fourteenth Amendment and "under color of law" under § 1983 mean essentially the same thing. *See, e.g.*, *United States v. Price*, 383 U.S. 787, 794, n.7, 86 S. Ct. 1152, 1157, n.7, 16 L. Ed. 2d 267 (1966), and *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 927, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982).

Although the Fourteenth Amendment and § 1983 both require state action, the United States Supreme Court has made it clear that, in certain circumstances, conduct of nominally private parties may be deemed state action under the Fourteenth Amendment and under color of law under § 1983. The test, in all of these cases, is whether the alleged infringement of federal rights is "fairly attributable to the state." *Lugar*, *supra*, 457 U.S., at 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982).

Generally the Court has adopted four tests in determining when private conduct may be treated as either "state action" or "under color of state law." These tests are the following:

1.      The "symbiotic relationship test," as illustrated by *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961). In that case, the Court held that the

action of a nominally private parking ramp, which was leased from the Wilmington, Delaware

state parking authority, constituted state action for the purpose of § 1983.

In holding the symbiotic relationship between the restaurant and the parking

authority to be sufficient to constitute state action, the Court noted:

> [T]he commercially leased areas [of the parking ramp] were not surplus state
> property, but constituted a physically and financially integral and, indeed,
> indispensible part of the State's plan to operate its project as a self-sustaining unit.

*Id.*, at 723-724.

The Court went on to state:

> Neither can it be ignored, especially in view of Eagle's (the restaurant's)
> affirmative allegation that for it to serve Negros would injure its business, that
> profits earned by discrimination not only contribute to, but are indispensible
> elements in, the financial success of a governmental agency.

> Addition of all these activities, obligations and responsibilities of the Authority,
> the benefits mutually conferred, together with the obvious fact that the restaurant
> is operated as an integral part of a public building devoted to a public parking
> service, indicates that degree of state participation and involvement in
> discriminatory action which it was the design of the Fourteenth Amendment to
> condemn.

*Id.*, at 724.

That Court rejected the assertion that the state itself had no motive to discriminate, by

stating, " no state may effectively abdicate its responsibilities by either ignoring them or by

merely failing to discharge them whatever the motive may be." The Court concluded:

> [W]hen a State leases public property in the manner and for the purpose shown to
> have been the case here, the proscriptions of the Fourteenth Amendment must be
> complied with by the lessee as certainly as though they were binding covenants
> written into the agreement itself.

*Id.*, at 726.

2.      The state "command and encouragement test," as illustrated by *Moose Lodge*

*No. 107 v. Irvis*, 407 U.S. 163, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972). In that case, the Court

held that a private club, which operated pursuant to a state-issued liquor license, did not act with state action when it refused service of food and beverage to a guest of one of its members because of the guest's race. In doing so, the Court nonetheless held, "Our cases make it clear that the impetus for the forbidden discrimination need not originate with the state if it is state action that enforces privately originated discrimination." *Id.*, at 172.

However, it stated that, "Where the impetus for the discrimination is private, the state must have 'significantly involved itself with invidious discriminations,' [citation omitted], in order for the discriminatory action to fall within the ambit of constitutional prohibition." *Id.*, at 173.

The Court distinguished *Burton* as follows:

> Here there is nothing approaching the symbiotic relationship between lessor and lessee that was present in *Burton*, where the private lessee obtained the benefit of locating in a building owned by the state-created parking authority, and the parking authority was enabled to carry out its primary public purpose of furnishing parking space by advantageously leasing portions of the building constructed for that purpose to commercial lessees, such as the owners of the Eagle restaurant. Unlike *Burton*, the Moose Lodge building is located on land owned by it, not by any public authority. Far from apparently holding itself out as a place of public accommodation, *Moose Lodge* quite ostentatiously proclaims the fact that it is not open to the public at large (footnote omitted) nor is it located and operated in such surroundings that although private in name it discharges a function or performs a service that would otherwise in all likelihood be performed by the state.

*Id.*, at 174.

The Court distinguished its earlier decision in *Pub. Utilities Comm'n v. Pollak*, 343 U.S. 451, 72 S. Ct. 813, 96 L. Ed. 1068 (1952), "where the regulatory agency had affirmatively approved the practice of the regulated entity after full investigation, the Pennsylvania Liquor Control Board has neither approved nor endorsed the racially discriminatory practices of the Moose Lodge." *Id.*, at 176, n.3).

The Court held that extensive governmental regulation, standing alone, did not convert private conduct into state action stating, "[the regulation] cannot be said to in any way foster or even encourage racial discrimination. Nor can it be said to make the state in any realistic sense a partner or even joint venturer in the club's enterprise." *Id.*, at 166-167.[4]

3.    The joint participation doctrine, as illustrated by *Lugar, supra*, where the Court held that a private party's joint participation with a state official in a conspiracy to discriminate would constitute state action for Fourteenth Amendment purposes.

4.    The "public function test," as illustrated by *Jackson v. Metro Edison Co.*, 419 U.S. 345, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974), in which the Court held that a state-regulated public utility which cut off a customer's service without notice and a hearing, did not constitute "state action" for Fourteenth Amendment purposes. The Court stated:

> We have, of course, found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the state. [Citations omitted.] If we were dealing with the exercise by Metropolitan of some power delegated to it by the state which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one. But while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities, it imposes no such obligation on the state.

*Id.*, at 353, 95 S. Ct., at 454.

The Court contrasted the situation in *Jackson* with its earlier decision in *Pub. Utilities Comm'n v. Pollak*, 343 U.S. 451, 72 S. Ct. 813, 96 L. Ed. 1068 (1952). In that case, the Court held that the First Amendment right of bus customers was not violated by the Transit's installation of a piped music system on its buses. The Court stated:

---

[4] Notwithstanding the fact that the Court held that the discriminatory act itself did not constitute state action, the Court nonetheless did enjoin the regulation of the State Liquor Control Board affirmatively requiring every club to adhere to all of the provisions of its constitution and by-laws, where those by-laws in fact mandated discrimination. *See*, *id.*, at 177.

The District of Columbia Public Utilities Commission, on its own, commenced an investigation of the effects of the piped music and, after a full hearing, concluded not only that the transit's practices were "not inconsistent with public convenience, comfort, and safety," but also that the practice, "in fact, through creation of better will among passengers … tends to improve the conditions under which the public ride." [Citation omitted.] Here, on the other hand, there was no such imprimatur placed on the practice of Metropolitan about which petitioner complains. The nature of government regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practices by ordering it, does not transmute a practice illustrated by the utility and approved by the commission "state action."

*Id.*, at 356-357, 95 S. Ct., at 456-457.

Judged by these standards, it is clear that the actions of Whittier Alliance complained of here constitute "state action" under the Fourteenth Amendment and were undertaken "under color of state law," within the meaning of Title 42 U.S.C. Sec. 1983.

First, there is clearly a symbiotic relationship between the parties, just as there was in *Burton*. The City provides the Whittier Alliance with money, and the Whittier Alliance, in turn, performs governmental functions on behalf of the City, including funding housing projects, public safety projects, youth projects and similar activities. Indeed, the City and the State serve each other's needs, much as did the restaurant and the parking lot in *Burton*.

Secondly, there is clearly state command and encouragement. The City, despite nominally requiring inclusion and a democratic form of government and its guidelines, in fact has given explicit approval to Whittier Alliance's discriminatory practices, in particular, its deliberate exclusion of Plaintiffs from their right to seek elective office within Whittier Alliance. Moreover, the discriminatory and censorial amendments to Whittier's by-laws were done with the express participation of the City's employee.

Thirdly, it is clear that the parties jointly participate in administering City programs, including the process for election and governance.

Finally, Whittier Alliance, in conjunction with the City, plainly performs the City's traditional public functions.

As a result, the actions of Defendant Whittier Alliance should be considered state action for the purpose of applying constitutional requirements.

**B.      DEFENDANT WHITTIER'S ACTIONS DEPRIVE PLAINTIFFS OF RIGHTS GUARANTEED THEM UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**1.      THE FIRST AMENDMENT PROTECTS PLAINTIFFS' RIGHT TO SEEK ELECTIVE OFFICE.**

It is undisputable that Plaintiffs' right to seek elective office in a quasi-governmental agency falls within the purview of First Amendment protection. The Minnesota Supreme Court recognized this in *Johnson v. State, Civil Serv. Dept.*, 280 Minn. 61, 65, 157 N.W.2d 747, 750 (1968), when it stated:

> An understanding of this sensitive area in which an individual's freedom ends and the state's power begins requires acceptance of the threshold principle that the right to run for public office when employed as a means of expressing an individual's political view is protected against infringement by the First Amendment.

The United States Supreme Court reaffirmed this principle in a case arising out of Minnesota, *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002), when it invalidated the Minnesota Supreme Court's canon of judicial conduct, which prohibited candidates for judicial election from announcing their views on disputed legal or political issues.

It is this right which the by-law amendments which Plaintiffs seek to enjoin infringes upon.

### 2.      THE BY-LAW PROVISIONS IN QUESTION ARE CONTENT-BASED RESTRICTIONS ON FIRST AMENDMENT RIGHTS.

Among the most basic rules of First Amendment law is the United States Supreme Court's strong condemnation of governmental decisions which discriminate on the basis of constitutionally protected speech. The most basic rule was clearly set forth by the Court in *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 92 S. Ct. 2287, 33 L. Ed. 2d 1212 (1972), in which the Court invalidated a Chicago city ordinance prohibiting picketing in the vicinity of a school, with the exception of labor picketing. In declaring that ordinance unconstitutional, the Court stated:

> The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter. Peaceful picketing on the subject of a school's labor-management dispute is permitted, but all other peaceful picketing is prohibited. The operative distinction is the message on the picket sign. But above all else, the First Amendment means that government has no power to restrict expression because of its message, its idea, its subject matter, or its content. [Citations omitted.] To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." [Citation omitted.]

> Necessarily then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas" and the government must afford all points of view and equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from the public forum may not be based on content alone, and may not be justified by reference to content also.

*Id.*, at 95-96, 92 S. Ct., at 2290.

More recently, in *Regan v. Time, Inc.*, 468 U.S. 641, 648-649, 104 S. Ct. 3262, 3266-3267, 82 L. Ed. 2d 487 (1984), the Court declared, "regulations which permit the government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment."

More recent invalidation of content-based regulation of speech may be found in *U.S. v. Eichman*, 496 U.S. 310, 110 S. Ct. 2404, 110 L. Ed. 2d 287 (1990); *Texas v. Johnson*, 491 U.S. 397, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989); *Boos v. Barry*, 485 U.S. 312, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 112 S. Ct. 501 (1991).

In *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S. Ct. 1505, 123 L. Ed. 2d 99 (1993), the Court invalidated a content-based distinction, even when that distinction was between commercial and non-commercial speech. In that case, the Court invalidated a city ordinance prohibiting the distribution of "commercial handbills" on public property, when that ordinance was used as a basis for removing news racks from public sidewalks.

The case involved an attempt by the City of Cincinnati, motivated "by its interest in the safety and attractive appearance of its streets and sidewalks" to prohibit free-standing news racks containing commercial publications, while permitting identical news racks for non-commercial publications. In declaring the ordinance unconstitutional, the Court, in an opinion by Justice Stevens, stated the following:

> Not only does Cincinnati's categorical ban on commercial news racks place too much importance on the distinction between commercial and non-commercial speech but in this case, the distinction bears no relationship whatsoever to the particular interest the City as asserted (emphasis by the Court).

113 S. Ct., at 1534.

In terms of the City's asserted interest in aesthetics and safety, the Court stated the

following:

> The City has asserted an interest in aesthetics, but respondent Publisher's news racks are no great an eyesore than the news racks permitted to remain on Cincinnati's sidewalks. Each news rack, whether containing "newspapers" or "commercial handbills" is equally unattractive…
>
> As we had explained, the City's primary concern, as argued to us, is with the aggregate number of news racks on the streets. On that score, however, all news racks, regardless of whether they contain commercial or non-commercial publications, are equally at fault.

*Id.*, at 1514-1515.

The Court concluded:

> In the absence of some basis for distinguishing "newspapers" and "commercial handbills" that is relevant to an interest asserted by the City, we are unwilling to recognize Cincinnati's bare assertion that the "low value" of commercial speech is a sufficient justification for its selective and categorical ban on news racks dispensing "commercial handbills."

*Id.*, at 1516.

Indeed, in *Republican Party of Minnesota v. White*, the United States Supreme Court

clearly invalidated a content-based restriction upon the right to seek elective office, stating the

following:

> As the Court of Appeals recognized, the announced clause both prohibits speech on the basis of content and burdens a category of speech that is "at the core of our First Amendment freedoms" – speech about qualification of candidates for public office. [Citation omitted.] The Court of Appeals concluded that the proper test to be applied to determine the constitutionality of such a restriction is what our cases have called strict scrutiny…; the parties do not dispute that this is correct. Under the strict-scrutiny test, respondents have the burden to prove that the announced clause is (1) narrowly tailored, to serve (2) a compelling state interest. [Citations omitted.] In order for respondents to show the announced clause is narrowly tailored, they must demonstrate that it does not "unnecessarily circumscrib[e] protected expression." [Citation omitted.]

536 U.S.  at 774-775, 122 S. Ct., at 2534-2535.

Clearly, the requirement that prospective candidates for the Board "not have committed an act of malice or defamation against the Whittier Alliance or any member of the Board of Directors," or "otherwise disrupt the aims and purposes of the Corporation," are clearly content-based restrictions on speech obviously designed for no other purpose than to prevent opponents of incumbent Board members from ever seeking election to the Board. Absolutely no compelling state interest supports such restrictions.[5] Moreover, the restriction is clearly not narrowly tailored and covers a substantial amount of protected speech.

**3.      THE BY-LAW AMENDMENTS VEST UNBRIDLED DISCRETION IN THE INCUMBENT BOARD OVER PLAINTIFFS' FIRST AMENDMENT RIGHTS.**

If there is one principle of First Amendment law that is absolutely clear and undisputed, it is the principle that government may not make the exercise of First Amendment rights contingent upon the discretion of a governmental official, regardless of whether that discretion is abused or even exercised. Any legal provision which permits a governmental official to grant or withhold permission to engage in First Amendment activities, without specifying narrow, objective and clearly-stated guidelines for the exercise of that discretion is facially unconstitutional, is a prior restraint on free expression.

This is the clear result of a long line of decisions in the First Amendment area, beginning with *Schneider v. State*, 308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939), in which the Supreme Court held unconstitutional an Irvington, New Jersey ordinance, dealing with house-to-house canvassers and solicitors. The ordinance required canvassers and solicitors to obtain a permit, which could not be issued if a Chief of Police decided "the canvasser is not of good character or

---

[5]   Obviously, the protection of incumbent Board members from being challenged is not a compelling state interest.

he is canvassing for a project not free from fraud." The Court held the permit requirement to be

an unconstitutional prior restraint on freedom of expression because the canvasser's "liberty to

communicate with residents of the town at their home depends upon the exercise of discretion."

*Id.*, at 164.

Similarly, in *Staub v. City of Baxley*, 355 U.S. 313, 78 S. Ct. 277, 2 L. Ed. 2d 302 (1958),

the United States Supreme Court declared unconstitutional a city ordinance requiring persons

seeking to solicit members for any organization requiring the payment of dues to apply to the

mayor and city council for a permit. In holding the ordinance unconstitutional, the Court

declared:

> It is settled by a long line of recent decisions in this Court that an ordinance
> which, like this one, makes the peaceful enjoyment of freedoms which the
> constitution guarantees contingent upon the uncontrolled will of an official – as
> by requiring a permit or license which may be granted or withheld at the
> discretion of such official – is an unconstitutional censorship or prior restraint on
> the enjoyment of those freedoms.

*Id.*, at 322, 2 L. Ed. 2d, at 311.

More recently, this principle has been used to invalidate city ordinances granting public

discretion to withhold a permit to demonstrate on the public streets, *Shuttlesworth v. City of

Birmingham*, 395 U.S. 147, 89 S. Ct. 935, 22 L. Ed. 2d 162 (1969), in giving public facilities for

activities entitled to First Amendment protection.[6]

Judged by these standards, the unconstitutionality of the new Whittier Alliance by-laws is

readily apparent. In the sole discretion of the incumbent Board of Directors, a candidate may be

disqualified if the incumbent Board deems him unable "to demonstrate current and ongoing

participation with the Whittier Alliance." Even worse, the incumbent Board is granted discretion

---

[6]   *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S. Ct. 1239, 43 L. Ed. 2d 488
  (1975).

to determine whether a challenger to that Board member's seat has "committed an act of malice or defamation against the Whittier Alliance or any member of the Board of Directors," or has otherwise disrupted the aims and purposes of the Corporation.

These are classic provisions which cannot be used to deny a candidate the right to run for office.

Moreover, unlike other areas of the law, where government agencies are given the benefit of the doubt and are presumed to exercise their authority in a constitutional manner, in the First Amendment area, the mere existence of censorial power, regardless of whether it is abused, compels facial invalidation of a statute, ordinance, or regulation. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988), in which the Court facially invalidated a Lakewood city ordinance giving the mayor discretion to authorize the placement of newsstands on public streets. In doing so, the Court explicitly rejected the claim that government could be trusted to exercise its discretion in a constitutional manner. The Court stated:

> The city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to standards absent from the statute's face. But this is the very presumption that the doctrine prohibiting unbridled discretion disallows. [Citation omitted.] The doctrine requires that the limits that the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well established practice. [Citations omitted.] This Court will not write nonbinding limits into a silent statute. [Footnote omitted.]

*Id.*, 108 S. Ct., at 2150-2151.

The principle was more recently reaffirmed in *Forsyth County, Ga. v. Nationalist Movement*, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992), in which the Court invalidated a county parade permit ordinance, on the ground of excessive discretion. In so doing, the Court stated:

The district court's finding that in this instance the Forsyth County Administrator applied legitimate, content-neutral criteria, even if correct, is irrelevant to this facial challenge. Facial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular decision. [Citation omitted.] 'It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion.' [Citation omitted.] Accordingly, the success of a facial challenge on the grounds that the ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so.

*Id.*, 112 S. Ct., at 2403, n.10.

Finally, it should be noted that where a licensing ordinance is facially unconstitutional because of an excessive grant of discretion, it is not necessary to apply for the license before bringing a facial challenge. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S. Ct. 596, 604-605 (1990). Because the by-law amendment here grants to the incumbent Board of Directors unfettered discretion to deny Plaintiffs the right to seek office, there is no need for them to seek office and be disqualified, in order to bring a facial challenge.

As a result, Plaintiffs are clearly likely to prevail on the merits of their First Amendment Challenge.

## III.    THE SECURITY REQUIREMENT OF RULE 65(C) SHOULD BE WAIVED.

Federal Rules of Civil Procedure 65(c) provides, in pertinent part, as follows:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the judge deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

It is absolutely clear that when Rule 65(c) grants to the Court the authority to set security in such sum and the Court deems proper, the Court, in its discretion, has the authority to waive the security requirement altogether. *See, e.g.*, *People of the State of California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319 (9th Cir. 1985); *Powelton Civic*

*Homeowners Ass'n v. Dept. of Hous. & Urban Dev.*, 284 F. Supp. 809 (D. Penn. 1968); *Bivins v.*

*Bd. of Pub. Educ. & Orphanage for Bilb County*, 284 F. Supp. 888 (D. Ga. 1967).

In the case most directly on point, *Mga Susu, Inc. v. County of Benton*, 852 F. Supp. 807,

813 (D. Minn. 1993), this Court waived the security requirement in issuing a preliminary

injunction against the enforcement of an ordinance subjecting an adult entertainment use to a

conditional use permit requirement, stating:

> Plaintiff requests that the court waive the security ordinarily required under
> Rule 65(c) of the Rules of Civil Procedure. Plaintiff asserts that no demonstrable
> harm will befall defendant if it is wrongfully restrained from enforcing the code
> pending the outcome of this action. The defendant does not appear to object to the
> waiver and is not pointed to any costs or monetary damage it might incur if it
> were enjoined from enforcing the code's conditional use permit requirement.
> Moreover, plaintiff seeks to vindicate important First Amendment rights. To
> provide security would prevent judicial review of the code's constitutionality.
> Under the circumstances, the requirement of security should be waived.

Virtually identical facts are applicable here. To be sure, Defendant Whittier Alliance may

incur some nominal expenditures in holding a new election, but those expenditures are entirely

of its own doing, by virtue of having adopted the unconstitutional by-law amendments. In any

event, Plaintiffs do not seek to have the election cancelled, only postponed, so whatever

expenditures were advanced for the present election, no additional expenditures will be required

for an election held sometime in the future.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for preliminary injunction and

temporary restraining order should be, in all respects, granted; the Board of Directors' election

scheduled for March 26, 2015 should be postponed until such time as all candidates have the

opportunity to run for office, without the restrictive by-law amendments, enacted for the sole

purpose of keeping Plaintiffs from running.

Respectfully submitted,

Dated: March 23, 2015. /s/ Randall D. B. Tigue
Attorney Reg. No. 110000
201 Golden Valley Office Center
801 North Lilac Drive
Golden Valley, MN 55421
Telephone: (763) 529-9211
tiguelaw@msn.com

and

Dated: March 23, 2015. /s/ Robert Speeter
Attorney Reg. No. 161743
Speeter & Johnson
1515 Canadian Pacific Plaza
120 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 339-7566
robert@speeterjohnson.com

ATTORNEYS FOR PLAINTIFFS