UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Basim Sabri, Marty Schulenberg, Mohamed
Cali, Jay Webb, and Zachary Metoyer,

       Plaintiffs,  Court File No. 15-CV-01578 (ADM/SER)

vs.            **MEMORANDUM OF POINTS AND**
             **AUTHORITIES IN OPPOSITION**
Whittier Alliance, a Minnesota not-for-profit **TO DEFENDANTS' MOTION**
corporation, and City of Minneapolis,   **TO DISMISS COMPLAINT AND**
a municipal corporation,        **IN SUPPORT OF PLAINTIFFS'**
             **MOTION FOR PRELIMINARY**
       Defendants.   **INJUNCTION**

---

## FACTS

In their submissions to the Court, Defendants have, if anything, reinforced the facts alleged by Plaintiffs in their original motion for preliminary injunction and temporary restraining order. The facts fall into two categories: first of all, the nature of the relationship between Defendant City of Minneapolis and Defendant Whittier Alliance; secondly, the failure of Defendant Whittier Alliance to live up to the City-mandated procedures which are intrinsic to its recognition as a neighborhood organization and its receipt of City funding; and thirdly, the refusal of Defendant City of Minneapolis to enforce its own regulations, resulting in the deprivation of Plaintiffs' constitutional rights.

## THE RELATIONSHIP BETWEEN DEFENDANT CITY OF MINNEAPOLIS AND DEFENDANT WHITTIER ALLIANCE

The documents submitted by Defendants clearly show that, originally under the Neighborhood Revitalization Program ("NRP"), currently the Community Participation Program ("CPP"), Defendant City of Minneapolis grants recognition to Defendant Whittier Alliance as a co-partner in a number of governmental functions, including housing programs, which include

the conversion of rental property to home ownership, a guaranteed mortgage program, matching deferred loans for exterior improvements to affordable single family homes, and a single family home loan program; public safety, including the hiring at public expense, a safety coordinator, and coordinating police patrols and citizen patrols; youth programs, including the creation of a youth council, and funding of youth programming and activities; business activity, including the creation of a parking plan, a pedestrian overlay zoning district, a commercial revolving loan program, and the creation of a housing and commercial development manager; community outreach activities, including a limited English proficiency plan, various community activities; and a public art program.[1]

However, as a *sine qua non*, for Defendant Whittier Alliance to receive the City's largesse and ability to participate and, in many cases, direct public city programs, the Whittier Alliance is required to operate under basic democratic principles, including no one from its activities. These activities, as set forth in Section II of the City's CPP for Minneapolis neighborhood organizations, attached as Exhibit 1 to the Sarff Affidavit, states in pertinent part as follows:

> A neighborhood organization must meet all of the following criteria to be considered eligible for Community Participation Program funding. The organization must:…
> (2)     Provide for the participation of all segments of the neighborhood, including, but not limited to, home owners, renters, property owners, business owners, immigrants, non-English speakers, low-income residents and communities of color.
> (3)     Ensure that membership in the organization is open to all residents of the geographically defined neighborhood. Neighborhood organizations may not impose membership dues or require attendance at a certain number of meetings before voting rights are conferred.
> (4)     Hold regular open meetings and take positive steps to encourage all interested parties to attend and participate. An organization may only hold closed meetings in the case of labor management and legal disputes.

---

[1]   *See* Whittier NRP Phase II Action Plan, filed as Document No. 21-4.

(5) Be incorporated (or identify an appropriate fiscal agent) and have adopted by-laws. The organization must also have a grievance procedure by which its members may have their concerns addressed by the organization, a conflict of interest policy and procedure, and Equal Opportunity Employment (EOE) or Affirmative Action (AA) plan and policy, and an Americans with Disabilities Act (ADA) plan and policy.

(6) Have a board of directors elected, at least in part, annually by the membership of the organization. Neighborhood residents must comprise a majority of the organization's board. An elected board must be in place for a minimum of one year prior to the beginning of the contract year to be considered eligible for funding.

In order to assure that these democratic principles are implemented, the same document, in Section VII, provides for a grievance procedure whereby the City will assure that the democratic processes required are adhered to.

## THE FAILURE OF DEFENDANT WHITTIER ALLIANCE
## TO LIVE UP TO THE CITY'S MANDATED STANDARDS

The evidence before the Court overwhelmingly indicates that the Whittier Alliance has consistently failed to meet the minimum standards of democratic processes and inclusion mandated by Defendant City of Minneapolis. This, in turn, has consisted of three separate strategies: first, the incumbent Board of Directors, overwhelmingly Caucasian, has adopted standards and policies deliberately designed to exclude minorities, particularly Somalis, from participation in neighborhood activities; secondly, the Whittier board incumbents deliberately excluded minorities and critics from running for the board; and finally, the Whittier Board incorporated discriminatory and exclusionary provisions into its by-laws.

Article III, Section 1, of the 2006 version of the Whittier Alliance By-Laws, a copy of which is attached as Exhibit A to the original Metoyer Affidavit, provides as follows:

**General Membership.** This Corporation is open to everyone who:
A. Is eighteen (18) years or older, and
B. Resides, owns property, owns or represents a for-profit or non-profit business (one representative per business) in the Whittier neighborhood, and
C. Supports the aims and purposes of the Corporation as per Article II, and

D.   Agrees to abide by all its Articles of Incorporation and By-Laws.

In order for a business to be recognized as a member, and have voting rights to vote for the Board of Directors at an annual meeting, Article III, Section 3, provides as follows:

> Each Whittier for-profit or non-profit business has one (1) vote. The business or appointed representatives of the business must provide proof that the business is located in Whittier by providing a copy of the business location in Whittier, by presenting a copy of the business license, a copy of a current utility bill as above, a listing in the current Minneapolis phonebook or a listing in the current Whittier Business Directory.

Beginning in 2012, multiple Somali businesses sought membership in the Whittier Alliance pursuant to this provision.

Beginning in 2012, Plaintiff Basim Sabri, the landlord of a mall containing literally hundreds of Somali businesses, became concerned that Somali businesses were being systematically excluded from membership in the Whittier Alliance and from inclusion in the Whittier Business Directory, which automatically granted voting rights in the Whittier Alliance. He engaged in an e-mail exchange with Whittier Alliance Executive Director Marian Biehn, copies of which are attached as Exhibits to his Affidavit.

Plaintiff Sabri then tasked his employee, Martha Schiller, with compiling a list for inclusion in the Directory. She prepared a template for a petition seeking membership in the Business Directory and thereby membership in Whittier Alliance. Plaintiffs Marty Schulenberg, Mohamed Cali, Jay Webb, and Zachary Metoyer circulated the petition and obtained over 100 signatures.[2] Osman Ahmed then delivered the list to Whittier Alliance by e-mail.[3] In the e-mail exchange between Plaintiff Sabri and Ms. Biehn, Plaintiff Sabri offered to provide copies of leases as additional proof that the individuals and businesses interested in being added to the

---

[2] *See* Affidavits of Plaintiffs Schulenberg, Cali, Webb, and Metoyer.

[3] The list of Somali businesses, containing over 100 signatures, is attached as Exhibit A to the Affidavit of Mohamed Cali.

Business Directory in fact resided and operated in the Whittier neighborhood. Ms. Biehn replied that a lease was not an acceptable form of proof, notwithstanding the plain language of the By-Laws which state that a "location in Whittier" was sufficient to establish membership.

Although the list containing over 100 individuals seeking admission to the Whittier Alliance was submitted well in advance of the March 2013 annual meeting of Whittier Alliance, absolutely none of those individuals were added to the Directory for activation of membership.[4]

Ms. Schiller attended the March 2013 annual meeting. Prior to the meeting, she prepared a template for the purpose of compiling identification about the individuals who had previously submitted information for the purpose of being added to the Business Directory. These people showed up at the March 2013 annual meeting with photo ID, business license, and other form of proof. They were denied the right to vote at the annual meeting.[5]

In the middle of January 2014, eight personalized form letters were submitted to the Whittier Alliance, including, as additional proof, copies of business licenses or copies of information of a business available on the Secretary of State's website. All eight were accepted into membership. However, they were not accepted into membership until after the March 2014 annual meeting had been held.[6]

Near the end of January or beginning of February 2014, a month before the March 2014 annual meeting, Ms. Schiller presented 47 additional personalized form letters containing the identical proof as were the eight that were accepted. None of these 47 were added to the Business Directory or granted membership prior to the March 2014 election.[7]

---

[4] *See* Schiller Affidavit ¶ 9.

[5] *See* Schiller Affidavit ¶ 12 and Exhibit B.

[6] *See* Schiller Affidavit ¶¶ 16-17.

[7] *See* Schiller Affidavit ¶¶ 20-21.

Prior to the March 2014 annual meeting, Ms. Schiller prepared the identical form letter, with supporting information, for an additional 34 individuals and businesses. None were permitted to vote at the March 2014 annual meeting.[8]

Clearly, the Whittier Alliance, in order to protect the incumbents, has systematically excluded, with only a few exceptions, Somali businesses for membership in the organization.[9]

Not content with excluding Somali-American businesses from membership, and thus the ability to vote for the Board of Directors, the incumbent Board went further and, applying entirely post-hoc rules,[10] established a minimum "activity" requirement in order to run for the Board. And of course, the persons administering this "activity" test were members of the incumbent Board, who were therefore given the authority to pick and choose their opponents. Despite the long record of activity in the Whittier neighborhood of both Plaintiffs Sabri and Cali,[11] both were barred from running because they had been insufficiently "active," as were Plaintiffs Schulenberg and Webb.

This blatant exclusion of legally qualified candidates from being able to run for the Board of Directors was made the subject of a grievance, pursuant to Section VII of the CPP guidelines. Notwithstanding the requirement that participation in the organization was to be open to all, Defendant City of Minneapolis rubber-stamped this exclusionary action.

In rejecting the grievance, David Rubedor, Director of Defendant City of Minneapolis' Neighborhood and Community Relations Office, wrote:

---

[8] *See* Schiller Affidavit ¶¶ 22-24.

[9] *See* Exhibit G to original Metoyer Affidavit.

[10] As noted in Plaintiffs' original submissions, at the time of the March 2014 annual meeting, the only requirement set forth in the By-Laws to run for the Board of Directors is that one be a member of the organization.

[11] See their respective affidavits describing at length their prior activities in the neighborhood.

> The findings recommend that the Neighborhood and Community Relations staff require Whittier Alliance to revise its by-laws to be more explicit on its election process and the qualifications for Board candidacy; and to develop clear election procedures that guide its process and are included with other election materials. <u>The Neighborhood Support Specialist assigned to Whittier has been working with the Whittier Alliance to update their by-laws and will continue to assist with these items to assure that they are implemented well in advance of the next annual meeting</u>.(Emphasis supplied.)

The result of these revised By-Laws adopted under the direct supervision of Defendant City of Minneapolis were By-Laws that require candidates to "be able to demonstrate current and ongoing participation with the Whittier Alliance," and "not have committed an act of malice or defamation against the Whittier Alliance or any member of the Board of Directors or otherwise disrupt the aims and purposes of the corporation." *See* Revised By-Laws at Article V, Section 2.

In its responsive papers, Defendant City of Minneapolis identifies the neighborhood specialist involved, who asserts that she did not write the revised By-Laws, but her role was only to assure that the revised By-Laws comported with the City's CPP guidelines.

In other words, the City rubber-stamped, as compliant with guidelines requiring an open democratic process and the exclusion of no one, a by-law revision which gave a blank check to incumbent Board members to exclude anyone who had been critical of their operations.

Based upon these facts, Plaintiffs urge the denial of Defendants' dismissal motions and the granting of Plaintiffs' motion for preliminary injunction.[12]

---

[12] Plaintiffs' original motion was brought prior to the March 2015 Board of Directors election and sought to enjoin that election. As Judge Tunheim wrote in the Order denying the temporary restraining order, the preliminary injunction motion is now converted to one invalidating the results of the March 2015 election, and ordering a new one, with the offending By-Law provision stricken.

**ARGUMENT**

I.    **PLAINTIFFS HAVE STANDING TO BRING THE PRESENT ACTION.**

Defendants assert that Plaintiffs lack standing to challenge the By-Law provisions in question, since they have not sought to run for office and been disqualified under the By-Laws. The law is clear that such conduct is not necessary to give Plaintiffs standing. Directly on point in this regard is *281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011). In that case, plaintiffs, who were members of grass roots advocacy organizations founded to oppose school funding ballot initiatives, challenged a provision in the Minnesota Fair Campaign Practices Act ("MFCPA"), which provided, in relevant part:

> A person is guilty of a gross misdemeanor who intentionally participates in the preparation, dissemination, or broadcast of paid political advertising or campaign material … with respect to the effect of a ballot question, that is designed or tends to … promote or defeat a ballot question, that is false, and the person knows is false or communicates to others with reckless disregard of whether it is false.

Plaintiffs asserted, *inter alia*, that they declined to participate in a 2008 campaign regarding a school funding ballot initiative for the Orono school district, because they feared repercussions arising from that section.[13]

In rejecting Defendants' standing arguments, the Eighth Circuit stated:

> To establish injury in fact for a First Amendment challenge to a state statute, a plaintiff need not have been actually prosecuted or threatened with prosecution. [Citation omitted.] Rather, plaintiff need only establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute. Self-censorship can constitute injury in fact… The relevant inquiry is whether a party's decision to chill his speech in light of the challenged statute was "objectively reasonable." [Citation omitted.]

*Id.*, at 627.

The court also rejected the assertion that Plaintiffs lacked standing because they have not alleged that they wished to engage in knowingly or recklessly false statements. The court stated:

---

[13] *Id.*, at 626.

> We acknowledge that plaintiffs have not alleged that they wish to knowingly make false statements of fact. However, plaintiffs *have* (emphasis by the court) alleged that they wish to engage in conduct that could reasonably be interpreted as making false statements with reckless disregard for the truth of those statements and that, therefore, they have reasonable cause to fear consequences of Section 211B.06. We hold that, given the specifics of the challenged statute and the nature of the standing analysis in First Amendment political speech cases, this is enough to establish that plaintiffs' decision to chill their speech was objectively reasonable.[14]

The court went on to note:

> The chilling effects of Section 211B.06 cannot be understood apart from the context of the speech it regulates: political speech about contested ballot initiatives. Plaintiffs persuasively argue that deciding whether a statement was made "reckless disregard for the truth" often proves difficult; (footnote omitted) this inquiry leaves substantially more room for mistake and genuine disagreement…[15]

The court also rejected defendants' ripeness argument stating:

> Here, defendants' ripeness challenge failed because plaintiffs' injury has already occurred and will continue to occur at defined points. Plaintiffs' injury is not based on speculation about a particular future prosecution or the defeat of a particular ballot question. Rather, the injury is that speech has already been chilled and speech that will be chilled each time a school initiative is on the ballot because of the very existence of Section 211B.06. (Footnote omitted.)

Absolutely the identical situation exists here today. The prohibition of candidates who have engaged in malice or defamation of the incumbent Board was clearly aimed at these Plaintiffs and no one else. Every one of the Plaintiffs has stated in his affidavit that he declined to run in the March 2015 election because of this provision. Because they declined to run in the present election because of the existence of this by-law provision, Plaintiffs' speech has already been chilled and Plaintiffs have already suffered injury in fact.

In this regard, *see also*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223-224, 110 S. Ct. 596, 603-604, 107 L. Ed. 2d 603 (1990), in which the United States Supreme Court held that

---

[14] *Id.*, at 628.

[15] *Id.*, at 629-630.

9

plaintiffs had standing to bring a facial challenge to an unconstitutionally overbroad licensing law, without ever having sought a license or having been denied a license after having sought one. So, in this regard, given the facial over-breadth of the by-law at issue here, there is clearly no requirement that these Plaintiffs seek election under the by-law that was clearly intended for no purpose other than to exclude them.

## II. THERE IS SUFFICIENT STATE ACTION TO WARRANT LIABILITY UNDER SECTION 1983.

Both sides have cited a number of cases on the issue of whether or not, because of the nature of the regulation involved, the discriminatory and censorial actions of Defendant Whittier Alliance can be attributed to Defendant City of Minneapolis.

The case most instructive cited by Defendants is *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982). In that case, former teachers and a vocational counselor at a private non-profit school for maladjusted high school students brought a civil rights action against the school, alleging that they were discharged without the due process required by the Fourteenth Amendment to the United States Constitution.

The school received substantial public funding and was subject to substantial government regulation. Nonetheless, the court held that the school's action did not constitute state action within the meaning of the Fourteenth Amendment, nor were the actions taken "under color of state law" under 42 U.S.C. § 1983. However, its reasoning is extremely instructive in the instant case. In reviewing the district court decision, the United States Supreme Court noted:

> Noting that, although the State regulated the school in many ways, it imposed few conditions on the school's personnel policies. The district court concluded that the nexus between and the State was not sufficiently close so that the action of the school in discharging Rendell-Baker could be considered action of the Commonwealth of Massachusetts.

*Id.*, at 836, 102 S. Ct., at 2768.

10

The court went on to cite *Adickes v. S. H. Kress Co.*, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970), stating, "A state normally can be held responsible for a private decision only when it is exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to that of the state."[16]

The court stated:

> Here, the decisions to discharge petitioners were not compelled or even influenced by any state regulation. Indeed, in contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters.

*Id.*, at 841, 102 S. Ct., at 2771.

Exactly the opposite situation exists here. Far from showing little interest in the democratic nature of neighborhood organizations, the City of Minneapolis insists that neighborhood organizations follow democratic processes, and be open to all in terms of membership and candidacy, as a *sine qua non* of being recognized as a neighborhood organization and receiving public funds thereunder.

In the instant case, it is absolutely clear that the decisions of the Whittier Alliance were, in effect, decisions of the City of Minneapolis. It was the City of Minneapolis that rejected Plaintiffs' grievance allowing Whittier Alliance to make up qualifications, after the fact, and to have the incumbent Board use them, at its sole discretion, for the purpose of disqualifying their opponents. When the City rubber-stamped the anti-democratic action of the Whittier Alliance, it <u>required</u> Whittier Alliance to rewrite its By-Laws, and sent its own representative to supervise the rewriting process.

The only reason that Whittier Alliance was able to adopt a by-law, which in effect excludes from running for the Board anyone who is critical of the incumbents, was that the City

---

[16] Cited at *id.*, at 840, 102 S. Ct., at 2771.

of Minneapolis approved this revision, notwithstanding its purported policy of requiring openness and democracy.

Clearly, the actions of the Whittier Alliance, under the facts of this case, are the actions of the City for the purpose of both the Constitution and 42 U.S.C. § 1983.

### III. PLAINTIFFS' SUIT IS NOT BARRED BY FAILURE TO SEEK OR COMPLETE ADMINISTRATIVE REVIEW THROUGH THE GRIEVANCE PROCESS.

Defendant City of Minneapolis argues that Plaintiffs' suit should be barred, first because Plaintiffs failed to grieve, through the grievance process, Defendant Whittier Alliance's deliberate exclusion of Somali businesses from participating in the annual meeting, and secondly, failed to appeal administratively the City's decision to approve the exclusion of Plaintiffs from running for the Board in March 2014. Both arguments are without merit.

Directly on point in this regard is the decision of this Court in *Fantasysrus 2, LLC v. City of East Grand Forks*, 881 F. Supp. 2d 1024 (D. Minn. 2012). In that case, this Court, by the Honorable John R. Tunheim, rejected an argument that plaintiffs could not bring a facial challenge, under the First Amendment, to the City's zoning code because abstention under *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971), was required because the plaintiffs had failed to exhaust the administrative remedies available under the zoning code. Judge Tunheim first pointed out that, in general, plaintiffs are not required to exhaust administrative remedies, before filing a Section 1983 action in federal court, citing *Patsy v. Bd. of Regents of the State of Fla.*, 457 U.S. 496, 500, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982).[17]

The Court then noted the distinction most circuits have adopted with respect to exhaustion of administrative procedures:

> Other circuit courts looked at the type of administrative proceeding – coercive or remedial – to determine if abstention is required. [Citation omitted.] Although the

---
[17] Cited at 881 F. Supp. 2d, at 1029.

12

> Eighth Circuit has not adopted this analysis, (footnote omitted), the Court finds that it is consistent with Supreme Court precedent and instructive in this case.
>
> A state proceeding is generally "coercive" if it was initiated by the state, making plaintiff's participation mandatory or if the federal plaintiff is contending the state proceeding as unlawful. [Citation omitted.] A proceeding is also "coercive" if the plaintiff "has committed an alleged bad act" and "the state proceeding [was] initiated to punish the plaintiff." [Citation omitted.] In contrast, a state proceeding is generally "remedial" if the plaintiff initiated a state proceeding of his or her own volition to right a wrong inflicted by the state or if the federal plaintiff is using the state proceeding to seek a remedy for some other state-inflicted wrong. [Citation omitted.] Courts employing this framework hold that coercive proceedings are entitled to Y*ounger* deference and require federal plaintiffs to perfect their section 1983 claims by exhausting state remedies. [Citation omitted.] Because fantasysrus would have had to appeal Ellis's (*sic*) determination to initiate an administrative proceeding, any further state proceeding would be remedial, not coercive. Consequently, under coercive/remedial analysis, no abstention is required.

*Id.*, at 1030.

Using this analysis, it is clear that no *Younger* abstention is required because the grievance procedure in question is remedial and not coercive. The administrative procedure was not initiated by the state or was not initiated at all to punish the Plaintiffs for a bad act. Quite the contrary, the grievance procedure is there to enable Plaintiffs of their own volition to correct a wrong inflicted by the state. As a result, the proceedings in question are remedial and not coercive and therefore the failure to exhaust those remedies is not a bar to the present Section 1983 action.

**IV.    THE PRELIMINARY INJUNCTION SHOULD REQUIRE THAT BOTH THE 2014 AND 2015 ANNUAL ELECTIONS BE NULLIFIED AND NEW ELECTIONS HELD.**

As already noted, *supra*, the original motion for temporary restraining order and preliminary injunction was brought prior to the March 2015 Whittier Alliance annual election being held. In denying the motion for temporary restraining order, Judge Tunheim wrote that Plaintiffs' remedy would consist of invalidating the 2015 election and requiring that a new election be held.

Given that as the remedy, the Court should invalidate the 2014 election as well, based upon the unconstitutional exclusion of Plaintiffs from running for that election, based upon post-hoc requirements added by the incumbent Board, when the By-Laws themselves required only membership in the organization.

Directly on point in this regard is the decision of the United States Supreme Court in *Powell v. McCormack*, 395 U.S. 486, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969). In that case, the United States Supreme Court overturned the refusal of the United States House of Representatives to seat Adam Clayton Powell as a member of Congress, when Representative Powell was elected by his constituents and met all of the minimum requirements contained in the Constitution to be a member of the member of the United States House of Representatives.

In validating the actions of the House of Representatives, the Court concluded:

A fundamental principle of our representative democracy is, in Hamilton's words, "that the people should choose whom they please to govern them." [Citation omitted.] As Madison pointed out at the convention, this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself.

*Id.*, at 547, 89 S. Ct., at 1977.

The Court concluded:

[A]nalysis of the "textual commitment under Article I, Section 5 [Citation omitted.], has demonstrated that in judging the qualifications of its members congress is limited to the standing qualifications prescribed in the constitution. Respondents can see that Powell met these… Therefore, we hold that since Adam Clayton Powell, Jr., was duly elected by the voters of the Eighteenth Congressional District of New York and was not ineligible to serve under any of the provisions of the constitution, the house was without power to exclude him from membership."

*Id.*, at 550, 23 S. Ct., at 1979.

Under the *Powell* decision, Plaintiffs, having fully met all qualifications for membership on the Board of Directors to serve on that Board, could not be excluded by post-hoc requirements imposed by an incumbent Board seeking to limit their potential opponents.

If Plaintiffs were insufficiently experienced or qualified to serve on the Board of Directors, that was a decision for the electorate, not the incumbent Board, to make.

Further, in ordering new elections, this Court should ensure that no arbitrary decisions to exclude eligible Somali voters for the Whittier Alliance should be tolerated.

A new proposed Order incorporating those requirements will be filed contemporaneously with this memorandum.

## **CONCLUSION**

For all of the foregoing reasons, as well as those set forth in Plaintiffs' original submissions, Defendants' motion to dismiss should be denied, Plaintiffs' motion for preliminary injunction should be granted, and new elections ordered for both 2014 and 2015, with arbitrary restrictions on candidacies prohibited and all illegible voters being permitted to vote.

Respectfully submitted,

Dated: April 22, 2015.    /s/ Randall D. B. Tigue
Attorney Reg. No. 110000
201 Golden Valley Office Center
801 North Lilac Drive
Golden Valley, MN 55421
Telephone: (763) 529-9211
tiguelaw@msn.com

and

Dated: April 22, 2015.    /s/ Robert Speeter
Attorney Reg. No. 161743
Speeter & Johnson
1515 Canadian Pacific Plaza
120 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 339-7566

ATTORNEYS FOR PLAINTIFFS