# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Basim Sabri, Marty Schulenberg,
Mohamed Cali, Jay Webb, and Zachary
Metoyer,

        Plaintiffs,

        v.

Whittier Alliance and City of
Minneapolis,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 15-1578 ADM/SER

---

Randall D. B. Tigue, Esq., Randall Tigue Law Office, PA, Golden Valley, MN, on behalf of
Plaintiffs.

Matthew P. Webster, Esq., Gray Plant Mooty Mooty & Bennett, PA, Minneapolis, MN, on behalf
of Defendant Whittier Alliance.

Kristin R. Sarff, Esq., Minneapolis City Attorney's Office, Minneapolis, MN, on behalf of
Defendant City of Minneapolis.

---

## I. INTRODUCTION

On May 19, 2015, the undersigned United States District Judge heard oral argument on

Whittier Alliance's Motion to Dismiss [Docket No. 13] and City of Minneapolis' (the "City")

(collectively, "Defendants") Motion to Dismiss [Docket No. 18].  The Defendants argue that

Basim Sabri, Marty Schulenberg, Mohamed Cali, Jay Webb, and Zachary Metoyer (collectively,

"Plaintiffs") lack standing to assert constitutional challenges to the elections of Whittier

Alliance's Board of Directors.  Defendants additionally argue that Plaintiffs' claims are legally

flawed because Whittier Alliance is not a state actor.  Plaintiffs oppose the motions.  For the

reasons set forth below, the Defendants' motions are granted.

## II.  BACKGROUND[1]

### A.  Procedural Posture

Plaintiffs filed their Complaint [Docket No. 1] and Motion for Preliminary Injunction and Temporary Restraining Order [Docket No. 2] on March 24, 2015.  Plaintiffs sought a preliminary injunction to enjoin Whittier Alliance from conducting its board of directors election scheduled for March 26, 2015.  On March 25, 2015, United States District Judge John R. Tunheim held a telephonic conference on the matter, and later that day, denied Plaintiffs' Motion.  See Min. Entry [Docket No. 11]; Order [Docket No. 10] ("TRO Order").[2]  In denying the motion, Judge Tunheim determined that Plaintiffs had not adequately demonstrated a threat of irreparable harm that warranted enjoining the election and that any harm could be sufficiently ameliorated by vacating the March 26, 2015 election and ordering Whittier Alliance to perform a constitutionally permissive election at a later date if Plaintiffs eventually proved successful on the merits of their claims.

On April 1, 2015, both Whittier Alliance and the City moved to dismiss.

### B.  Factual Background

In approximately 1987, the City engaged in a process to protect and revitalize its

---

[1] Ordinarily, when considering a motion to dismiss, courts ignore materials outside of the pleadings.  Porous Medica Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).  Here, because the Complaint describes Whittier Alliance's by-laws and references allegedly discriminatory actions taken by the Board of Directors, the by-laws and materials describing the alleged discrimination are "necessarily embraced by the pleadings."  See id. (noting that courts may consider materials that are matters of public record or "necessarily embraced by the pleadings") (citations omitted).

[2] Because the undersigned judge was unavailable, Judge Tunheim presided over Plaintiffs' preliminary injunction motion.

neighborhoods through the creation of the Neighborhood Revitalization Plan ("NRP").  Compl.

¶¶ 5 6.  The NRP, now called the Community Participation Program ("CPP") administers

revitalization programs and government funding through private neighborhood organizations.

The City has established a list of eight criteria neighborhood organizations must meet in order to

be eligible for City funding.  The criteria are:

1. Represent a geographically-defined neighborhood (in its entirety) within
   Minneapolis as identified by the most current Minneapolis Communities and
   Neighborhoods Map as amended and approved by the City Council [ ].

2. Provide for the participation of all segments of the neighborhood, including,
   but not limited to, homeowners, renters, property owners, business owners,
   immigrants, non-English speakers, low-end income residents and communities
   of color.

3. Ensure that membership in the organization is open to all residents of the
   geographically defined neighborhood.  Neighborhood organizations may not
   impose membership dues or require attendance at a certain number of
   meetings before voting rights are conferred.

4. Hold regular open meetings and take positive steps to encourage all interested
   parties to attend and participate.  An organization may only hold closed
   meetings in case of labor management and legal disputes.

5. Be incorporated (or identify an appropriate fiscal agent) and have adopted
   bylaws.  The organization must also have a grievance procedure by which its
   members have their concerns addressed by the organization, a conflict of
   interest policy and procedure, an Equal Opportunity Employment (EOE) or
   Affirmative Action (AA) plan and policy, and an Americans with Disabilities
   Act (ADA) plan and policy.

6. Have a board of directors elected, at least in part, annually by the membership
   of the organization.  Neighborhood residents must comprise a majority of the
   organization's board, an elected board must be in place for a minimum of one
   year prior to the beginning of the contract year to be considered eligible for
   funding.

7. Have the capacity to properly manage and account for grant funds.  This
   includes, but is not limited to, being current on all reporting on any previous

Community Participation Program grants.

8. Organizations that primarily represent the interest of one segment of the neighborhood or concentrate primarily on one issue are not eligible (such as homeowner associations, rental property owner associations or business associations).

Id. Ex. A ("CPP Guidelines") 2 3. Whittier Alliance has been the designated representative of the City's Whittier neighborhood since 1991. Whittier Alliance is governed by a set of by-laws and has a 15 member Board of Directors. Members are elected by the eligible voting membership of the Whittier Alliance at its annual meeting and serve three year terms. Metoyer Aff. [Docket No. 4] Ex. A ("2006 By-Laws") 4.

The Whittier neighborhood   bounded by Franklin Avenue in the north, Interstate 35W on the east, Lyndale Avenue on the West, and Lake Street to the south   is racially diverse; 2010 demographic statistics show a near equal split between Caucasian and ethnic minorities. Compl. ¶¶ 12 13. Plaintiffs assert the Board of Directors has remained almost uniformly Caucasian because the Board of Directors has deliberately taken steps over the years to exclude racial and ethnic minorities from being elected to the Board. Id. ¶ 16. Plaintiffs allege these discriminatory steps include:

Adopting interpretations of the Whittier Alliance by-laws, clearly at odds with the plain language of the by-laws, for the deliberate purpose of excluding Somali-American businesses from membership in the organization and the right to vote at the organization's annual meeting.

Deliberately failing to permit Somali businesses to register for the Whittier business directory, which would give them membership in the organization and the right to vote for the board of directors.

Deliberately denying to Plaintiffs, most of whom are ethnic or racial minorities, the right to run for the board of directors at the 2014 annual meeting, clearly for the purpose of excluding them from participation, and perpetuating the incumbent

4

board of directors in power.

Deliberately adopting amendments to the by-laws of the organization, ahead of the 2015 election, for the deliberate purpose of excluding racial minorities and critics of the incumbent board from access to running for the board of directors.

Id.

### 1. Somali Business Owners

Plaintiffs allege that in 2013, the Board of Directors adopted membership criteria designed to exclude racial and ethnic minorities from membership in Whittier Alliance, and thus from being able to vote in the Board of Directors election.  Metoyer Aff. ¶¶ 6, 18.  At that time, membership was open to people over 18 years old who either resided, owned property, or owned a business in the Whittier Neighborhood.  2006 By-Laws at 1.  Business owners were to prove their Whittier Neighborhood eligibility by "presenting a copy of the business location in Whittier, by presenting a copy of the business license, a copy of a current utility bill . . ., a listing in the current Minneapolis phone book or a listing in the current Whittier Business directory."  Id. at 2. Plaintiffs allege Somali-owned businesses were denied membership despite providing leases showing that they operated a business in the Whittier Neighborhood.  Metoyer Aff. ¶¶ 13, 14, 17, 18.  Plaintiffs contend these actions were taken contrary to established by-law provisions to preserve the nearly all-white Board of Directors.  Id. ¶ 18.

### 2. 2014 Board of Directors Election

Plaintiffs contend they each applied to run in the 2014 Board of Directors election.  Id. ¶ 22.  Zachary Metoyer's ("Metoyer") application was accepted.  Id. ¶ 25.  The other four Plaintiffs received an email from the Executive Director of Whittier Alliance, which read:

Thank you for submitting your application for Whittier Alliance Board Candidacy.

The Board met and reviewed all applications and determined that you do not meet all of the eligibility criteria at this time.

The job description you received for a position on the Board indicates that Board members are legally responsible for all activities of the organization, which is true for all Minnesota non-profit corporations such as Whittier Alliance.  The job description sets out specific categories of responsibility, including human resources, planning, finance, community relations, and organizational operations.  The application for the Board position requested information about your experience working with Whittier Alliance, your skills and your interest in being a Board member.  Because of the legal and financial responsibilities required of a member of the Board of Directors, the Board of Directors has determined that the Board Candidate eligibility rests not only on an applicant's residence or ownership of business property in the Whittier neighborhood, but also on an applicant's documented history of engagement with the organization and support for the aims and purposes of the Whittier Alliance (a criteria specified in Article III, Section 1, of the bylaws).  Your application did not indicate that you have participated in Whittier activities in the past and, for that reason, your application was not approved at this time.

Id.  These Plaintiffs then filed an administrative grievance with the Board of Directors against Whittier Alliance, challenging its decision to reject their Board of Director applications.  Id. Ex. C.  Metoyer, a former board member whose candidacy application was not rejected, also joined in the grievance, claiming that while he previously served on the Board he was solicited to make financial contributions as a condition of Board membership, which was not required by the by-laws.  Id.  The grievance was ultimately denied by the sitting Board of Directors.  Id. Ex. D.

Plaintiffs next brought their grievance to the City's Neighborhood and Community Relations Department.  Plaintiffs claimed that the disqualification criteria used by Whittier Alliance violated their First and Fourteenth Amendment rights.  Id. Ex. E.  The City, however, also rejected Plaintiffs' grievance and determined that its grievance procedure did not allow it to address Plaintiffs' constitutional claims.  In the rejection letter, the Director of the City's Neighborhood and Community Relations Office wrote:

6

The findings recommend that the Neighborhood and Community Relations staff require Whittier Alliance to revise its by-laws to be more explicit on its election process and the qualifications for Board candidacy; and to develop clear election procedures that guide its process and are included with other election materials. The Neighborhood Support Specialist assigned to Whittier has been working with the Whittier Alliance to update their by-laws and will continue to assist with these items to assure that they are implemented well in advance of the next annual meeting.

Id. ¶ 35.

### 3. 2015 By-Laws

Whittier Alliance amended its by-laws, effective January 12, 2015.  Id. ¶ 36; Ex. H.

Before the amendments, to be eligible for a Board of Director position, an individual need only

be a member of Whittier Alliance.  2006 By-Laws at 4.  The new by-laws added additional

qualifications, requiring each Board of Director member to:

> A. [B]e an eligible voting member for at least six months prior to the date of an application or appointment.
>
> B. [B]e able to demonstrate current and ongoing participation with the Whittier Alliance.
>
> C. [B]e able to demonstrate attendance at Whittier Alliance sponsored meetings or task forces within the current year.
>
> D. [S]upport the aims and purposes of the Corporation as per Article II.
>
> E. [A]gree to abide by its Articles of Incorporation and by-laws.
>
> F. [N]ot have committed an act of malice or defamation against the Whittier Alliance or any member of the Board of Directors or otherwise disrupt the aims and purposes of the Corporation.

Metoyer Aff. ¶ 37.

Plaintiffs contend that subparagraph F was added for the sole purpose of excluding

certain individuals, including Plaintiffs, who have voiced opposition against the incumbent

Board.  Plaintiffs contend they have demanded the Executive Director be fired and the entire

Board of Directors be removed for pursuing racist policies.  Id. ¶¶ 40  41.

### 4. 2015 Board of Directors Election

Whittier Alliance 2015 Board of Directors election took place on March 26, 2015.  None

of the Plaintiffs submitted applications or otherwise attempted to be a candidate in the election.

According to Plaintiffs, the decision not to run was exclusively based on the allegedly

discriminatory nature of subparagraph F.

Plaintiffs allege Defendants have violated their rights under the First and Fourteenth

Amendments of the United States Constitution, as well as state rights arising under the

Minnesota Human Rights Act.  Plaintiffs primarily pursue equitable relief and seek an Order

vacating the 2014 and 2015 elections and ordering Whittier Alliance to hold new elections in

which Plaintiffs are permitted to be candidates for election to the Board of Directors.

## III.  DISCUSSION

### A.  Standard of Review

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to

dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P.

12(b)(6).  In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in

the light most favorable to the nonmoving party, and the facts alleged in the complaint must be

taken as true.  Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825

F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims

must be resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.

A pleading must contain "enough facts to state a claim to relief that is plausible on its

face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw a reasonable inference that

the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> "But

where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged    but not 'shown'    'that the pleader is entitled to relief.'"

<u>Id.</u> (quoting Fed. R. Civ. P. 8(a)(2)).

## B. Standing[3]

Defendants argue that Plaintiffs lack standing to bring their constitutional claims.

Defendants first argue that Plaintiffs cannot pursue any relief regarding the alleged

discrimination against Somali businesses because none of the Plaintiffs are Somali businesses or

business owners. As to the alleged discrimination arising from the 2014 election, Defendants

contend Plaintiffs further lack standing because each Plaintiff either withdrew their candidacy or

were determined to be ineligible under by-law provisions that have since changed. With respect

to the 2015 election, Defendants argue that because none of the Plaintiffs registered their

---

[3] Plaintiffs do not respond to Defendants' arguments that they lack standing to pursue their MHRA claims. Accordingly, Plaintiffs have abandoned that claim. <u>See</u> <u>Hacker v. Barnhart</u>, 459 F.3d 934, 937 n.2 (8th Cir. 2006) (noting that "[a] party's failure to raise or discuss an issue in [their] brief is to be deemed an abandonment of that issue.") (citation omitted). If not abandoned, Plaintiffs' MHRA claim would be dismissed on the merits because the cited provision in the Complaint, Minn. Stat. § 363A.17(3), only permits standing for discriminatory acts that occur "in the performance of a contract." <u>Krueger v. Zeman Const. Co.</u>, 758 N.W. 2d 881, 887 (Minn. Ct. App. 2008) <u>aff'd</u> 781 N.W.2d 858 (Minn. 2010) (citation omitted). Plaintiffs do not have a contractual relationship with the Defendants. Because no such contractual relationship is alleged, § 363A.17(3) does not provide Plaintiffs a cause of action.

candidacies or made any attempt to run for office, they have not suffered an injury in fact.

Plaintiffs do not directly respond to Defendants' arguments of their standing as Somali

businesses and business owners, or the 2014 elections.  Plaintiffs, do, however, argue that they

have suffered an injury in fact from the 2015 election sufficient to confer standing.  Plaintiffs

assert that the allegedly unconstitutional by-law provision, subparagraph F, was the reason each

of them decided not to run in the 2015 election.  Plaintiffs argue that this "chilling" of their

speech rights constitutes a cognizable injury sufficient to confer standing.

"Article III standing is a threshold question in every federal court case."  United States v.

One Lincoln Navigator 1998, 328 F.3d 1011, 1013 (8th Cir. 2003).  "The exercise of judicial

power under Art. III of the Constitution depends on the existence of a case or controversy."

Preiser v. Newkirk, 422 U.S. 395, 401 (1975).  A central component of the "case or controversy"

requirement is standing, "which requires a plaintiff to demonstrate the now-familiar elements of

injury in fact, causation, and redressability."  Lance v. Coffman, 549 U.S. 437, 439 (2007).  The

injury in fact element requires a plaintiff to allege "an invasion of a legally protected interest

which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

hypothetical."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

Plaintiffs' "chilling" argument has some traction in First Amendment jurisprudence.

However, such an argument only confers standing when a criminal statute is being challenged

and speech is chilled due to the threat of criminal prosecution.  In 281 Care Committee v.

Arneson, the plaintiffs claimed that a provision of the Minnesota Fair Campaign Practices Act

inhibited their ability to speak freely against certain school funding ballot initiatives.  638 F.3d

621, 625 (8th Cir. 2011) ("Care Committee II").  The challenged provision made it a gross

misdemeanor to advocate against a ballot initiative through false political advertising or

campaign material.  Id.  In analyzing the plaintiffs' First Amendment action, the District Court

wrote:

> One bringing a First Amendment challenge to a criminal statute "need not expose itself to arrest of prosecution" to demonstrate an injury in fact.  Saint Paul Area Chamber of Commerce v. Gaertner, 439 F.3d 481, 485 (8th Cir. 2006).  "[A]ctual injury can exist for standing purposes . . . as long as the plaintiff is objectively reasonably chilled from exercising his First Amendment right to free expression in order to avoid enforcement consequences."  Republican Party of Minn., Third Congressional Dist. v. Klobuchar, 381 F.3d 785, 792 (8th Cir. 2004).  But, to show an objectively reasonable chilling effect, a plaintiff must show "a credible threat of prosecution under [the] statute if the plaintiff actually engages in the prohibited expression."  Id.

281 CARE Committee v. Arneson, No. 8-5215, 2010 WL 610935, at *2 (D. Minn. Feb. 19,

2010) ("Care Committee I") (alterations in original).  The District Court granted the defendants'

motion to dismiss, finding that the "plaintiffs have failed to establish either that they actually

intend to engage in conduct targeted by the statute, or there is a credible threat of prosecution if

they do so."  Id.  The Eighth Circuit, however, reversed, finding first that the challenged

provision "presents a credible threat of prosecution sufficient to support a claim of objectively

reasonable chill in the First Amendment context," and finding second that plaintiffs "have

reasonable cause to fear consequences" of the challenged provision.  Care Committee II, 638

F.3d at 628.

In Care Committee I and Care Committee II, the "chilling" argument had merit because

of the threat of criminal prosecution.  The cases cited in the Care Committee decisions also

reference threat of criminal prosecution.  See Republican Party of Minn., 381 F.3d at 792

(finding that the threat of criminal prosecution can provide an injury in fact even if plaintiff has

11

not engaged in the prohibited conduct); St. Paul Area Chamber of Commerce, 439 F.3d at 485 ("A party, however, need not expose itself to arrest or prosecution in order to challenge a criminal statute."); Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 392 (1988) ("[P]laintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution.").[4]

Here, Plaintiffs' "chilling" argument does not provide standing to assert their constitutional claim because there is no threat of criminal prosecution. Unlike the cited cases, the only repercussion Plaintiffs faced if their election candidacies were ultimately rejected by Whittier Alliance was the inability to be a candidate in the election. As the cases establish, to have standing to challenge the by-laws where there is no threat of criminal prosecution, Plaintiffs must show both that they submitted their candidacies for the election and that they were rejected because of the by-law provision. Since none of the Plaintiffs sought to run in the 2015 election, Plaintiffs did not experience an injury in fact and therefore lack standing to assert their claims that Whittier Alliance's by-law provision is unconstitutional.[5]

---

[4] FW/PBS, Inc. v. City of Dallas, relied on by Plaintiffs, does not support their argument of chilling as an injury in fact conferring standing. 493 U.S. 215 (1990). There, the Supreme Court determined certain business owners lacked standing to challenge two provisions to a city ordinance regulating sexually oriented businesses. Id. at 231 34. As to the first provision, prohibiting "the issuance of a license to an applicant who has resided with an individual whose license application has been denied or revoked within the preceding 12 months," the plaintiffs lacked standing because "the record does not reveal that any party before us was living with an individual whose license application was denied or whose license was revoked." Id. at 231 33. In regard to the second provision, prohibiting individuals convicted of certain crimes from obtaining a license, "the record does not reveal any party who has standing to challenge the provision disabling an applicant who was convicted of any of the enumerated crimes." Id. at 234.

[5] The Court declines to independently analyze any of Plaintiffs' claims that may arise due to the alleged discrimination of Somali businesses or business owners. Because Plaintiffs are not

## C.  State Action

Even if Plaintiffs had standing to challenge the by-law provision, their claims fail on the merits because Whittier Alliance is not a state actor.  At least one judge in this district has already concluded that a neighborhood organization is not a governmental entity subject to § 1983 liability.  Rickmyer v. Browne, 995 F. Supp. 2d 989, 999 (D. Minn. 2014).  The organization at issue in Rickmyer was the Jordan Area Community Council, Inc., which, like Whittier Alliance, is a non-profit neighborhood organization of the City of Minneapolis.  Id. at 1020.  Plaintiffs here do not attempt to distinguish Rickmyer in their briefing nor offer any facts to differentiate the two neighborhood organizations.  Nevertheless, the Court will address Plaintiffs' arguments.

Not long after the passage of the Fourteenth Amendment, the Supreme Court decided that "[t]he provisions of the Fourteenth Amendment . . . all have reference to State action exclusively, and not to any action of private individuals."  Virginia v. Rives, 100 U.S. 313, 318 (1879).  Thus, conduct by private individuals, including Whittier Alliance, is not proscribed by the Constitution. However, ostensibly private conduct can by subject to Constitutional scrutiny if the actions can be "fairly attributable to the state."  Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982). There are two main ways to determine if conduct can be fairly attributable to the state:  the

---

members of either group, they lack standing.  See Blum v. Yaretsky, 457 U.S. 991, 999 (1982) (noting that standing requires the Plaintiffs to "show that [they are] within the class of persons who will be concretely affected").  Moreover, Plaintiffs' claims resulting from the 2014 election are defective.  The claims of the four Plaintiffs whose applications were rejected are moot because they arose under by-laws that have since been changed.  See Hechenberger v. W. Elec. Co., Inc., 742 F.2d 453, 455 (8th Cir. 1984) (noting that plaintiffs' claims were mooted because the statute they were suing under was amended).  As to Metoyer, he was placed on the 2014 ballot but withdrew his candidacy prior to the vote.  Christ Aff. [Docket No. 16] ¶ 21.  Thus, he does not have a cognizable injury in fact.

"public function exception" and the "entanglement exception."  Erwin Chemerinsky,

Constitutional Law Principles & Policies 529 (4th ed. 2011).  Therefore, if Plaintiffs can

demonstrate that Whittier Alliance falls within either exception, it will be deemed a state actor

for Constitutional purposes.

### 1. Public Function Exception[6]

Plaintiffs argue that Whittier Alliance, in conjunction with the City, performs the City's

traditionally public functions, such as funding housing projects, public safety projects, and youth

projects.  Thus, Plaintiffs conclude, Whittier Alliance is a state actor.

In Jackson v. Metropolitan Edison Co., the Supreme Court held that there is state action

"in the exercise by a private entity of powers traditionally exclusively reserved to the State."  419

U.S. 345, 352 (1974).  The Jackson Court rejected the argument that a private utility, with a

state-granted monopoly, performed a public function because running a utility was "not

traditionally the exclusive prerogative of the State."  Id. at 353.  The body of law addressing this

concept has uniformly held that this exception only transforms private conduct into public

conduct when the conduct is power that has been traditionally exclusively reserved to the state.

See Marsh v. Alabama, 326 U.S. 501 (1946) (running a city is a public function); Evans v.

Newton, 382 U.S. 296 (1966) (maintaining a municipal park is a public function); Rendell-Baker

v. Kohn, 457 U.S. 830 (1982) (holding no state action for terminating teachers at a private

---

[6] Plaintiffs' arguments to support Whittier Alliance is a state actor are included in both their Memorandum in Opposition to Whittier Alliance and the City's Motion to Dismiss [Docket No. 26] and in their Memorandum in Support for Temporary Restraining Order [Docket No. 3]. While the Court would normally restrict the analysis to the motion at hand and decline to address arguments raised in earlier memoranda, because of the procedural history, the Court will also address the arguments Plaintiffs raise in their memorandum supporting its motion for a preliminary injunction.

school).

An exhaustive list of functions traditionally and exclusively reserved to the state has not been clearly announced.  Nonetheless, the City's 2014-2016 CPP Guidelines evince that Whittier Alliance does not meet this standard.  The CPP Guidelines provide three explicit purposes for neighborhood organizations:  "1) identifying and acting on neighborhood priorities; 2) influencing city decisions and priorities; and 3) increasing resident involvement."  CPP Guidelines at 1.  Neighborhood organizations, including Whittier Alliance, "may use CPP funds to support ongoing community engagement activities, to develop a Neighborhood Priority Plan, or in support of priorities identified in the Neighborhood Priority Plan."  Id. at 2.  The goal of the Neighborhood Priority Plans is to "identify initiatives for the neighborhood organization, and to communicate neighborhood priorities to the City and other jurisdictional partners."  Id. at 8.

The CPP Guidelines do not suggest in any way that Whittier Alliance is exercising traditional state power.  Engaging community members to identify and act on neighborhood priorities is strikingly different from a power that is "traditionally and exclusively" reserved to the state, such as eminent domain power.  Jackson, 419 U.S. at 352.  Indeed, funding housing projects, public safety projects, youth projects, and similar activities are not powers exclusively reserved to the state.  The City has many for-profit and non-profit organizations operating within its limits dedicated to performing these same tasks.  Thus, under the public function exception, Whittier Alliance is not a state actor.

## 2. Entanglement Exception[7]

Plaintiffs argue that Whittier Alliance is sufficiently entangled with the City to transform it into a state actor.  As evidence of entanglement, Plaintiffs cite to the funding arrangement between the City and Whittier Alliance, the City's explicit approval of the allegedly discriminatory by-laws, and the City and Whittier Alliance jointly participating in administrative City programs.  Defendants contend that Plaintiffs failed to offer any evidence to support holding Whittier Alliance as a state actor.

### a. Symbiotic Relationship Test

Plaintiffs first argue that under Burton v. Wilmington Parking Auth., Whittier Alliance has a symbiotic relationship with the City and makes it a state actor.  365 U.S. 715 (1961).  In Burton, a city operated a parking authority that leased space to a private restaurant which denied service to a customer on account of that person's race.  Id. at 716.  In concluding there was a "symbiotic relationship" between the city and the restaurant in part because the government benefitted from the revenues of the restaurant, the Court noted:

> [the] Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property, and prestige behind the admitted discrimination.  The State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity.

Id. at 725.  However, in the years following Burton, the Supreme Court has retreated over time from its holding, noting in 1995 that "[o]ur decision in Burton, however, was quite narrow. . . .

---

[7] Plaintiffs' brief supporting its motion for a temporary restraining order explicitly references four "tests" for determining state action.  One, the "public function test," is addressed above.  The others, labeled the "symbiotic relationship test," the "command and encouragement test," and "the joint participation doctrine," are all covered under the umbrella of the entanglement exception and will be discussed together.  Pls.' Mem. Supp. TRO 7  10.

We have since noted that Burton limited its actual holding to lessees of public property and our recent decisions in this area have led commentators to doubt its continuing validity." Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 409 (1995) (internal quotation marks and citation omitted).  More recently, the Court noted that

> Burton was one of our early cases dealing with "state action" under the Fourteenth Amendment, and later cases have refined the vague "joint participation" test embodied in that case.  Blum and Jackson, in particular, have established that privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of Burton.

Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 57 (1999) (internal quotation marks omitted).

Under the current state of the law, Whittier Alliance does not have a symbiotic relationship with the City.  Unlike Burton, the City has not "elected to place its power, property, and prestige behind the admitted discrimination," nor has it "insinuated itself into a position of interdependence" with Whittier Alliance.  Burton, 365 U.S. at 725.  While the City and Whittier Alliance are invested in each other's success, Whittier Alliance maintains a significant independence from the City, including its own governance.  Whittier Alliance is not a state actor under this test.

### b.  Command and Encouragement Test

Plaintiffs next argue that since the City commanded and encouraged Whittier Alliance's alleged discrimination by explicitly approving and jointly participating in the creation of the by-law provision at issue, state action exists.  As support for their argument, Plaintiffs cite Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972).  In Irvis, the Court held that a private club operating pursuant to a state-issued liquor license did not act as a state actor when it refused to

17

serve a guest due for racial reasons.  In so holding, the Court stated that the "forbidden

discrimination need not originate with the state if it is state action that enforces privately

originated discrimination."  Id. at 172.  However, "where the impetus for the discrimination is

private, the State must have significantly involved itself with invidious discriminations in order

for the discriminatory action to fall within the ambit of the constitution prohibition."  Id. at 173

(internal quotation marks and citation omitted).  A few years later, the Supreme Court held in

Blum, that a state can be "held responsible for a private decision only when it has exercised

coercive power or has provided such significant encouragement, either overt or covert, that the

choice must in law be deemed to be that of the state."  457 U.S. at 1004 (citing Flagg Bros., Inv.

v. Brooks, 436 U.S. 149, 166 (1978)).  The Blum Court further stated that "[m]ere approval of or

acquiescence in the initiatives of a private party is not sufficient to justify holding the State

responsible for those initiatives under the terms of the Fourteenth Amendment."  Id. at 1004  05.

Plaintiffs do not aver that the City exercised power or provided significant

encouragement for Whittier Alliance to draft and adopt the challenged by-law provision.  The

Complaint merely alleges that "Defendant City of Minneapolis has either deliberately approved

or, at least exceeded or acquiesced to, these discriminatory actions by the Whittier Alliance board

of directors."  Compl. ¶ 17.  In their memorandum supporting their motion for a temporary

restraining order, Plaintiffs allege the by-law amendment was "written with the assistance of

Defendant City of Minneapolis."  Pls.' Mem. Supp. TRO 4.  Plaintiffs further aver "the City

rubber-stamped . . . a by-law provision," describing the City's involvement as:

> The findings recommended that the Neighborhood and Community Relations staff
> require Whittier Alliance to revise its by-laws to be more explicit on its election
> process and the qualifications for Board candidacy; and to develop clear election

> procedures that guide its process and are included with other election materials.
> The Neighborhood Support Specialist assigned to Whittier has been working with
> the Whittier Alliance to update their by-laws and will continue to assist with these
> items to assure that they are implemented well in advance of the next annual
> meeting.

Pls.' Mem. Opp'n. Mot. Dismiss 7.

The City's involvement with the by-law at issue does not transform Whittier Alliance into

a state actor.  "Approving," "acquiesc[ing]," or "assist[ing]" are markedly different from the

degree of participation required by Supreme Court precedent.  While the City undoubtedly had a

role in the process, it cannot be fairly said that the City was "significantly involved," "exercised

coercive power," or "provided significant encouragement . . . that the choice must be deemed to

be that of the state."  Blum, 457 U.S. at 1004.  Thus, under Plaintiffs' command and

encouragement test, Whittier Alliance is not a state actor.

### c.  Joint Participation Doctrine

Finally, Plaintiffs argue that Whittier Alliance's joint participation with the City

constitutes state action for Fourteenth Amendment purposes.  Plaintiffs rely heavily upon

Rendell-Baker, 457 U.S. at 834  35, where a teacher of a non-profit school sued after she was

fired for her speech activities.  Despite being subject to substantial government regulation and

receiving the bulk of its funds from the public    in one year, public funds comprised 99% of the

school's operating budget    the Supreme Court held the school was a private actor.  Id. at

832  34, 43.  In arriving at its holding, the Court first concluded that merely receiving public

funds did not make the school's discharge decisions those of the state.  Id. at 840.  The Court

noted that the school is not "fundamentally different" from private businesses that depend

primarily on public contracts and that "[a]cts of such private contractors do not become acts of

19

the government by reason of their significant or even total engagement in performing public

contracts." Id. at 840  41.  In discussing the amount of state regulation, the Court noted a

distinction between the state's regulation of the school generally and the state's regulation

regarding the action that sprouted the lawsuit.  On this point the Court stated:

> [I]n contrast to the extensive regulation of the school generally, the various
> regulators showed relatively little interest in the school's personnel matters.  The
> most intrusive personnel regulation promulgated by the various government
> agencies was the requirement that the Committee on Criminal Justice had the
> power to approve persons hired as vocation counselors.  Such a regulation is not
> sufficient to make a decision to discharge, made by private management, state
> action.

Id. at 841  42.

Plaintiffs' argument of the City's involvement in the election decisions of Whittier

Alliance does not compel a different conclusion.  Whittier Alliance, similar to the school in

Rendell-Baker where tuition funding was tied to compliance "with a variety of regulations," must

comply with eight criteria and make good faith efforts to comply with 12 "Standards and

Expectations" to be eligible for CPP funding.  CPP Guidelines at 2  3.  Of the eight criteria, only

provisions five and six touch on by-laws and board of directors elections.  They read:

> 5.  Be incorporated (or identify an appropriate fiscal agent) and have adopted by-
> laws.  The organization must also have a grievance procedure by which its
> members may have their concerns addressed by the organization, a conflict of
> interest policy and procedure, an Equal Opportunity Employment (EOE) or
> Affirmative Action (AA) plan and policy, and an Americans with Disabilities Act
> (ADA) plan and policy.

> 6.  Have a board of directors elected, at least in part, annually by the membership
> of the organization.  Neighborhood residents must comprise a majority of the
> organization's board.  An elected board must be in place for a minimum of one
> year prior to the beginning of the contract year to be considered eligible for
> funding.

Id. at 3.  Even if these criteria are read with the City's larger intent to encourage neighborhood organizations to engage all racial and ethnic populations, such "regulation" is insufficient to make Whittier Alliance's adoption of the by-law amendment state action.  Id. at 3 4.  This is underscored by the City's previously discussed involvement in the creation of the by-law provision at issue.  Rubber-stamping the proposed by-law signals the City's "relatively little interest" in Whittier Alliance's by-laws and election procedures.  Rendell-Baker, 457 U.S. at 841.  Thus, Rendell-Baker confirms this Court's conclusion that Whittier Alliance is not a state actor.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant Whittier Alliance's Motion to Dismiss  [Docket No. 13] is

      **GRANTED**;

2.    Defendant City of Minneapolis' Motion to Dismiss [Docket No. 18] is

      **GRANTED**; and,

3.    The Complaint [Docket No. 1] is **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**

                                        BY THE COURT:


                                        s/Ann D. Montgomery
                                        ANN D. MONTGOMERY
                                        U.S. DISTRICT JUDGE

Dated: August 10, 2015

21